First case is 19-9599, Birhanu v. Barr. And Ms. Valdez, you may go first. Good morning, your honors. May it please the court. My name is Tanya Valdez, and I'm here on behalf of the petitioner, Mr. Birhanu, or as he prefers to be called, Teddy. I'd like to reserve three minutes for rebuttal. Teddy would like to be in court today, but he has been deported to Ethiopia, where he is locked inside a church as we speak. He is alone 24 hours a day and being denied mental health care and medication, just as he feared. Teddy has paranoid schizophrenia, a severe psychiatric disorder. He was a green card holder for more than 10 years at the time he was convicted of two crimes committed during a mental health crisis. His health and competency are interwoven throughout every issue before this court today. As described by a clinical psychologist, when he's receiving mental health treatment and effective medication, he's described as kind, insightful, and he experiences great shame about what he has done during psychotic episodes. But even when he is taking medication, he still experiences auditory hallucinations, anxiety, disorganized thinking, and shows moderate to severe cognitive impairments, according to a clinical psychologist. And despite his severe mental illness, the immigration judge found that he was competent to represent himself in challenging his grounds of removability and We do have on this record, do we not counsel that the IJ did question him and looked into issues of competency, asking him, you know, do you know who you are? You know what we're doing? What the purpose of this proceeding is? What more did you think that the IJ should have done? Right, Your Honor. So the IJ did conduct a judicial competency inquiry in this matter at the very beginning of his removal proceedings. But we, there were multiple points after that initial competency determination where the immigration judge should have noticed severe indicia of incompetency, including moments when the social worker had submitted a letter saying that she was having trouble communicating with him. And then, you know, toward the end of the case when the clinical psychologist submitted her own mental health evaluation and found moderate to severe impairments, that these should have been taken into account by the judge and that the procedures here... Was he represented by counsel during? No, he was not. He was pro se through the entire proceedings before the immigration judge. And then I entered as counsel on the BIA appeal. At what point then after the initial competency determination did the, did this go off the rails when the letter came in from the social worker or at some other time? So it was at one of the next hearings. I'm not exactly sure how much time passed in between, but it was where Teddy was filling out the asylum application. So it was relatively early on in proceedings when the social worker said that she was having trouble communicating with him, that the meeting had gone on for a very long time and she was concerned about his ability to even answer the basic questions on the form. Oh, go ahead. I was just going to ask you, Ms. Valdez, with regard to your point that the immigration judge should have detected other signs that he had lacked competency. Don't we lack jurisdiction to second guess the failure to recognize a lack of competency now on the larger issue of the whole procedure was a violation of due process. I understand you argue that we have jurisdiction to consider that, but can that extend to saying that the judge should have recognized signs of a lack of competency? Yes. So what we're saying here is not just a mere factual dispute. This arises to the level of a due process violation because the procedures here were inaccurate. He would have benefited from a competency hearing that reflected an expert opinion regarding his competency, for example. And if such an expert opinion by someone who is qualified to give those evaluation and uses standardized tests, then that would have adhered to due process requirements. So a central issue that I'd like to get to, because it's dispositive in this case, is deportability. Because he was a green card holder, the government here had the burden to prove by clear unequivocal and convincing evidence that he was deportable. And under the removal statute, the government therefore had to show unequivocally that Teddy was convicted of two crimes. And the government failed to meet its burden on both points. So starting with CIMT, the parties here are in agreement that the Utah conviction statute does not contain a mens rea associated with issuing threats, which means that the minimum mens rea required under state law here is recklessness. But reckless threats do not necessarily rise to the level of a CIMT. For it to do so, there have to be certain aggravating factors, none of which are present in this case. So for example... How, let's say I'm prosecuted for this crime, if I am consciously aware that there's a substantial risk that a threat could endanger others, and if I have a specific intent to clear the occupancy of a building, how is it possible for me to make a threat that is unintentional? Well, I think that's... So for example, on the facts in this case, so I'm not saying that the court should necessarily look at those, but I'm saying it's just an example of how this could happen, is that Teddy was in a mental health crisis at the time. And so I certainly think that that would be recklessness, where he was not even entirely aware of what he was doing. But he had to have been consciously aware of a substantial risk that the threat would endanger others, even with that mental illness. Well, even if there was awareness of causing a threat, I think Your Honor might be thinking of these cases from other circuits that government and the agency had relied on in this matter, that explore state statutes that differ significantly from the Utah statute at issue here, because those cases are looking at where there is a specific intent to terrorize. But here, there isn't even a specific intent to cause any kind of fear. There's only the intent to prevent occupation of a building, which could be through something such as annoyance. How would you, the government cites the Vigil case, Utah case, on this point, how would you distinguish Vigil? Yes, so the government talks about Vigil in the context of specific intent, trying to say that because there's specific intent in the second part of the statute, that it is extrapolated to Vigil itself. The court goes on to say that specific intent is with respect to the result, and not to the act itself. So it's with respect to the result of preventing occupation of a building, and not with respect to the reckless conduct. So don't we have that here? I mean, following on what Judge Bacharach asked, don't we have that here? That he intended to cause people to not enter that building. So going back to the, so this court has said that reckless threats only arise to a certain level when there's an aggravating factor. And so that's what the government's saying here, right, is that the specific intent is the aggravating factor. But the government hasn't shown, or the prevent occupation of a space rises to the level of a CIMT. So I think we just don't have an aggravating factor with culpable enough conduct that rises to the level of a CIMT here. And in order for the entire statute to be, I just don't think that there's support for the entire crime constituting a CIMT either. There's a Tenth Circuit case that says that a specific intent crime is one where an act was committed voluntarily and purposely. So that's where there's a specific intent crime, which is just not what we have here, because the act of issuing threats could have been done recklessly. So I'd like to move on to the single scheme determination. So this is the second part of the removal statute, again, where the government bore the burden of proving clearly and convincingly these crimes did not arise out of the same scheme. This issue is also reviewed de novo. So the immigration judge didn't order any briefing from the government, didn't take any argument from the government, and instead examined Teddy herself to make this determination. And Teddy contested that these were two separate incidents. He explained that they were, quote, similar incidents, similar case, and that both are arrests from his conflict with the university. Nonetheless, sorry, end quote. Nonetheless, the IJ noted that the incidents happened on December 21st and 24th and concluded, quote, they appear to be separate, end quote. So plainly, the fact that the IJ said the incidents appear to be separate shows that the evidence was not clear and convincing. So don't we have a separation of dates when these incidents occurred? I mean, it's not, you know, 10 in the morning, he did something at 1030, he did something else. We have two different types of threats, focusing on different entities and individuals on separate dates. Yes, so I agree with that, Your Honor. But the single scheme determination is circumstance specific. And there is no bright line rule about how much time passes. Rather, it's more of a circumstances test. So here, you know, where Teddy made these statements that they were arising out of a single scheme, and they were made for the single goal toward a single objective, we argue that they flowed from and were the natural consequences of a single scheme. And this is in the context of him being found guilty, but mentally ill at the time of commission of both offenses. And on top of that, you know, later in court, he also said that he didn't mean to threaten anyone, that he was not controlling himself. And that's on the record, as well. So one other point here that is also highly relevant, it's a test that the agency should have used, and should have taken Teddy's mental health into account in making this determination. And that's a test stated in matter of additiva and several other cases, whether Teddy had the opportunity to reflect and dissociate in between the incidents, which he was unable to do, because he was in a delusional and a paranoid state during in between the offenses. So, especially, you think it would matter for your argument, instead of, you know, to phone in threats, but say there'd been like a kidnapping associated with this, in addition to the threatening phone calls with that, would that still be a single scheme under your interpretation? Or would that be multiple? No, Your Honor, I think that would be multiple. Because so the kidnapping would be its own complete crime in and of itself. And here, you know, these two different instances of issuing different threats were toward the same goal, but they were similar in terms of conduct, where I think a kidnapping would be completely separate from issuing a threat, for example. And I see that I need to reserve the remainder of my time for rebuttal. All right. Unless there are any further questions. Thank you. Thank you. From the government, Ms. Otero. Good morning. May it please the Court. Vanessa Otero on behalf of the Attorney General. Your Honors, the petition for review should be dismissed in part and denied in part. I will focus my argument on the two main issues in this case. The first is that the government established by clear and convincing evidence that petitioner is removable as an alien convicted of crimes involving moral turpitude not arising out of a single scheme of criminal misconduct for his two convictions for threat of terrorism under Utah law. And second, that those convictions are particularly serious crimes, which render him ineligible for asylum and withholding of removal. If time remains, I will discuss the remaining issue about competency that counsel just raised. So as the court will know, to determine whether or not petitioner's convictions are crimes involving moral turpitude, you apply the categorical approach and compare the elements of the Utah statute to that of the federal definition of a CIMT. A CIMT is a crime that involves both reprehensible conduct and a culpable mental state. And the main issue here is whether or not the Utah statute contains the requisite culpable mental state, and the government's position is absolutely that it does. As counsel mentioned, the minimum conduct under the categorical approach here would be that a person would commit a threat of terrorism by recklessly threatening bodily injury, death, or substantial property damage, and acting with the intent to prevent or interrupt the occupation of a building. Now as the court correctly held or reasonably held, you have to read the statute as a whole. The second part of the statute, the result of the act has specific intent, whereas the first part, the threat, you would only need to have reckless intent. But reading those together, it's a specific intent crime. That's how the Utah Supreme Court interpreted a similar Utah statute that contained, that had two separate intents within one statute, which was the state v. vigil case when it interpreted obstruction of justice. In that case, the court concluded that despite the fact that the first part of the statute that enumerated certain activities as to the conduct could be performed with reckless intent, the result of that statute, the resulting part of that statute, had to be performed with specific intent. And at the end of the day, it was a specific intent crime. I think if the Utah Supreme Court had the opportunity to interpret and analyze this statute here, the threat of terrorism, it would come to the same conclusion because it's written in the same way. How do you deal with Ms. Valdez's argument that particularly with someone afflicted with mental illness, that they may be consciously aware of a risk that their words may have harmful consequences, but that particularly a mentally ill person could utter words, like say for someone with Tourette's syndrome, that was not necessarily designed to clear the occupancy of a building, but that they may have been aware of that risk and uttered those words nonetheless. And therefore, there could be a threat that was unintentionally made, albeit recklessly, and so there would not be an intent to make a threat. Well, at the end of the day, despite his mental health issues, he was convicted, which means that he pled guilty but mentally ill, which is permissible under Utah law, which means that the criminal court in Utah found that he satisfied the intent to be convicted under the statute. So, his mental health... But the conviction only required a reckless threat. Right. And so, that's what I'm trying to ask you is, couldn't there be a reckless, albeit unintentional threat and be convicted of that crime as long as you had an intent to clear the occupancy of a building? I'm not sure how anyone can make an unintentional threat. You still have to recklessly, with conscious disregard. I mean, if we're talking about this applying the categorical approach, I don't think the court has to or should look at the actual facts of the case. That's the point of the categorical approach. But you can imagine a scenario where someone didn't have the intent to make a threat, albeit could recklessly make a threat. You have to say under the categorical approach that the crime didn't categorically satisfy the criteria for being a crime of moral turpitude? No, because that doesn't take into account the second part of the Utah statute, that you have to have a specific intent to prevent the occupancy of a building. That's there, that you have to satisfy both parts. You can't just satisfy the one to be convicted under the statute. And that's what the criminal court found here, that he satisfied the intent for both. At least he pled guilty to that. That's all we know about that. There's not much more about his underlying proceedings in this record here. And so we're to look at this statute as a twofold kind of thing. Part of it requires reckless or can be satisfied with reckless conduct, and the second part satisfied with specific intent. Right. The first part can be satisfied with reckless. The second part has to be satisfied with specific intent. And that is the same I mean, I hope so. I don't remember what argument DHS made before the board. But yeah, I would hope the government made that argument. I'm sorry. Sure. And so the second part of that I want to touch on is that petitioner's crimes did not arise out of a single scheme of criminal misconduct. So the determinative test here is for one crime to flow from one another to satisfy the single scheme definition. The scheme must take place at one time, meaning that there's no substantial interruption that would allow the defendant to disassociate himself from his enterprise and reflect on what he has done. He is in crisis mentally. He maybe does not know difference between night and day. He just is acting out against people in places he does not like. And perhaps in this mental fog, there is no break in activity. I'm not sure that the single scheme test is meant to touch upon someone's psychological ability to disassociate. I think what matters here is whether or not the scheme is taking place at one time. I mean, another way you can look at it is where one crime flows from one another and is a natural consequence of the other. And as one of the judges pointed out earlier, I'm sorry, I don't have all of you on my screen here. These are two separate crimes on two separate dates, and he was convicted of two counts of threat of terrorism. One on December 21st, where he made threatening comments to kill people in person to three different people entering into a building on the university campus. And then several days later, he sent an email to a university employee stating that if he wanted to trespass, notice wouldn't stop him. Then he gave the university three days to resolve his complaints. So there's happening on two different dates. The threats are made in two different ways, one in person to people that he sees in front of a building, and the other ones are emails. And those are two days apart. Now, petitioners argument that he had a singular goal of making the university drop the student code charges. As we pointed out in our brief, that fails completely under the board's decision in matter ad atiba. And in that case, the board rejected a very similar argument stating that that would insulate from removal aliens who formulate a plan for multiple crimes, but would not insulate from removal aliens who commit more than one crime without a plan. And I think that applies here. And as far as the particularly serious crime issue, government's position is that the board applied the correct legal standard to conclude that petitioner's offenses were particularly serious, and therefore he's precluded from asylum. Why wouldn't his mental state or mental health be relevant to that particularly serious crime determination? Because the previous BIA cases do suggest that it is somewhat tailored or if we can look at circumstances surrounding a particular crime, why can't we look at the circumstances applying to the criminal? Because the board's precedent also states that it doesn't consider an alien's personal circumstances and equities in making a particularly serious crime determination in the government's view. The Ninth Circuit found that was an arbitrary and capricious distinction when applied to mental health. Right. Well, of course, the government's position is that the Ninth Circuit is wrong there. I think the only thing that GGS did differently than any of its prior precedents is that it sort of just refined that personal circumstances and equities bar, if you want to call it that, and said, well, this also applies to mental health. And I think it also, the board in that case also made a good point that mental health doesn't relate to the key issue in a particularly serious crime analysis, which is the nature of the conviction. I thought of NAM, it was the dangerousness to the community. Well, there is no separate dangerousness to community requirement. But that's what I, but I understand that. But GSS specifically relied on NAM and NAM, as I understand it, and in every one of the BIA opinions, it geared the particularly serious crime determination to appraising that the individual's dangerousness. And in NAM, it said, the BIA said, you consider all circumstances. So what's wrong with Ms. Valdez's argument in the Ninth Circuit's rationale that any of the, all circumstances would certainly include someone's mental illness, if you're evaluating dangerousness? Well, you're, what you're evaluating under the particularly serious crime analysis is the nature of the conviction, the type of the sentence imposed, and the circumstances and underlying facts of the conviction. And I understand your point that here we have a person with mental health issues. He was allowed to plead guilty with, but mentally ill, which was permissible under Utah law. So his mental health was taken into consideration for purposes of his conviction. Now, if we were to now go back in time and second guess that, we don't know how that, how that works in Utah. What were the circumstances surrounding that guilty, but mentally ill plea? And the government's position is that all of that still goes to his personal circumstances and equities. Right. And that's Ms. Valdez's argument, that you're not second guessing the conviction. He's still guilty of sin of the threat of, of this threat statute. She's not second guessing the conviction. What I think she's saying is under NAM, this is relevant, not to guilt under state law, but, but relevant to his dangerousness. And so how do you deal with the Ninth Circuit's rationale that you're not second guessing the validity of the conviction? You're simply including this as one of the many circumstances that can bear on someone's dangerousness. And well, it did bear on his, I mean, despite the fact that he was mentally ill, it did bear on the fact that he was still convicted. Nevertheless, the fact that, I mean, I think the other thing you have to remember here is that while the board said mental health isn't a factor when making a particular serious crime determination, the IJ did look at the fact that he was found guilty, but mentally, but mentally ill in, in reviewing the particular serious crime analysis. And the board made those two points. I think at the end of the day here, whether the board applied the correct precedent, it did. It was bound to apply GGS and it did so here. The IJ took into consideration his mental health and said, well, nonetheless, he was found guilty having found by, by the Utah criminal court and having found to satisfy the intent requirement for that crime. And and then went on to assess what he actually did here, which is in person threatened people to kill them and then send this other threatening email to university employees. So whether or not he's mentally ill, his, his acts were certainly dangerous and caused the university to go into lockdown and put a lot of people in fear. And the last point I want to make, because counsel raised it. So any question as to competency is a fact, the competency, competency itself is a factual determination and the court lacks jurisdiction to review that. The government's position is that counsel hasn't, or petitioner hasn't raised a valid and reviewable due process claim in connection with the competency claim. They only argue that the hearing was deficient, that the IJ didn't adequately assess his ability to understand the proceedings. But I think that the IJ did went above and beyond here with the competency hearing and reassess the alien's competency at subsequent hearings. And especially after there was that issue about the letter from a social worker saying he was having trouble understanding stuff, the IJ questioned him about that. I believe Mr. Burhanu said, well, at that time, I didn't think there was a problem when I was talking with my social worker. So there's a lot of, there's a lot of evidence here that shows that IJ went above and beyond. Now specifically, what you're saying we have no jurisdiction to consider is the due process issue. Is that your point? You don't have a jurisdiction to consider the facts, the competency decision itself. And we're saying that the due process claim is not a valid due process claim. So no jurisdiction to address the competency issue as regards what? At the hearing before the IJ? Correct. Whether or not he was competent, the court doesn't have jurisdiction to review that. The only way the court has jurisdiction, the only jurisdiction the court has with respect to competency is if petitioner were to raise a valid due process claim or a legal question. And the only thing they've done here is try to raise a due process claim, which we're saying isn't a valid due process claim. And I see that I'm out of time, but I'm going over. Thank you, counsel. Ms. Valdez, you have some rebuttal. Thank you, your honor. So on this last point about the competency, so counsel raised that Mr. Burhanu said that he didn't think he had a problem, but I think that's just the issue here is when the judge is asking a mentally or someone with paranoid schizophrenia with a diagnosis, IJ is very aware of that condition and then questions him to assess his competency and takes his own statement as true. I think this just shows like the procedural unfairness here that this may have been another moment where the IJ could have ordered a mental health evaluation done by a professional using standardized tests. I'd like to go back to the deportability issue on CIMT. So with respect to the specific intent in the second part of the statute, again, this is related to prevention of occupation of a building. And I think looking at these other, at the other circuit court's decisions on this is really helpful because they say that the specific intent to terrorize is an act accompanied by a vicious motive, but the Utah statute doesn't have that intent to terrorize. And so it's just preventing an occupation of a building is just not rising to the level of CIMT, moral turpitude misconduct. Judge Briscoe had also asked if the government briefed this specific intent issue at the BIA, and the answer is no. The government actually didn't contest the deportability arguments to the BIA, so it was not addressed there. And this is at AR 47 is where the briefing starts. On the single scheme, so the government argues that we could just let someone not be deported even if they commit a whole bunch of crimes. But I don't think that that's a worry here because again, this is a totality of the circumstance argument. And so what we're asking is for the whether here on the facts of this case, this constituted a single scheme. With respect to the particularly serious crime determination, correct that the court can, or the agency can consider all of the circumstances and underlying facts needs to be taken into account for the particularly serious crime. We're not relitigating any of the criminal issues that were before the serious crime determination. In this case, GGS was an arbitrary and capricious departure from previous board precedent. So I see I'm out of time there. And if there aren't any questions, I just think the court for its time. Thank you, counsel. We appreciate your arguments this morning. That was clarifying. And you are now excused and the case will be submitted.